UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

BILL STANLEY, *Administrator of the*  )
*Estate of Brandon Stanley*,     )
               )
  Plaintiff,        )   No. 6:16-CV-264-REW-HAI
               )
v.             )
               )   OPINION & ORDER
BOBBY JOE SMITH, et al.,    )
               )
  Defendants.      )

*** *** *** ***

This case is about a constable that ignored the peace aspect of being a peace officer. Kentucky's Constitution requires the elective position of county constable, and the General Assembly regulates the duties of the office. Constables are long on power but short on required training and qualifications. State law makes the constable a "peace officer," with resultant authorities, but does not require the certification and training most other such Kentucky officers mandatorily undergo. In March 2016, Bobby Joe Smith, a constable elected in Laurel County, tried to arrest Brandon Stanley at an East Bernstadt convenience store. Stanley, on bond and evidently awaiting state sentencing, had failure-to-appear warrants and had recently run from Smith after a traffic stop. The tragic store encounter, days later, resulted in Smith shooting the unarmed Stanley to death in the front aisle of the crowded A&B Market. This Court is the second to have a say in the events. Previously, a Laurel Circuit jury convicted Smith of reckless homicide in the death of Stanley, and the Laurel Circuit Court sent Smith to prison for the felony. The state jury's verdict gets respect here and goes far in resolving this case, a

constitutional and state tort action by Stanley's estate against Smith and the Laurel judge-executive.

Each party seeks summary judgment. Plaintiff Stanley[1] seeks "partial" summary judgment, moving the court to preclude Defendant Smith, the former Laurel County constable, from denying his state reckless-homicide conviction and liability for Brandon's wrongful death. DE 69. Defendant Westerfield, Laurel County's judge-executive, having previously prevailed on several claims at the 12(b)(6) stage, *see* DE 25 (Order), now moves the Court for summary judgment on the two remaining claims against him: the § 1983 official-capacity claim and the state-law personal-capacity claims based on a failure to supervise or train. DE 67. Defendant Smith seeks summary judgment on all[2] claims against him, which include personal- and official-capacity § 1983 claims based on excessive force, Kentucky constitutional claims, a state-law wrongful-death claim, and a punitive-damages claim. DE 71. Westerfield argues that, as a constitutionally elected position, a constable answers to no one other than his constituents, and that the County Executive has no ability, and thus no duty, to supervise or train the office. Smith focuses his efforts on arguing that his conduct did not violate an established right. Both Defendants also argue various applications of immunity.

As a matter of housekeeping, the Court acknowledges the disagreement between Stanley and Smith regarding the propriety of Smith's surreply (and Stanley's reply to the surreply). DE 100; DE 101; DE 103; DE 105; DE 106. "Although the Federal Rules of Civil Procedure do not

---

[1] To avoid confusion, the Court from here on uses "Brandon" to refer to Brandon Stanley, the decedent, and "Stanley" to refer to Bill Stanley, the case plaintiff and administrator of Brandon's estate.

[2] Or at least Smith characterizes his motion as defeating "all" claims. Smith does not actually address the § 1983 official-capacity claims in his briefing. Nor does Westerfield, relative to a Smith claim, for the county.

expressly permit the filing of surreplies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. TVA*, 339 F.3d 454, 481 (6th Cir. 2003). Here, Stanley acknowledges that his offensive motion lacks record citations, and he relies on documentary evidence and argument first raised in his reply. *See* DE 91. For example, Stanley attaches to his reply the jury instructions from Smith's criminal trial. DE 91-1. Thus, the Court considers Smith's surreply (DE 101). The Court does not allow or consider Stanley's proposed reply to Smith's surreply (DE 103), an excessive and unwarranted argument pathway.

For the following reasons, the Court grants Stanley's partial motion for summary judgment. Coupling that decision with Stanley's responses to Smith's motions, the Court grants Stanley summary judgment against Smith as to the § 1983 individual-capacity and wrongful-death claims. The Court grants Smith summary judgment on the claims under the Kentucky Constitution. The Court grants Westerfield summary judgment on the state-law individual-capacity claims (relating to supervision and training) and the § 1983 official-capacity claim. Accordingly, punitive damages are not available against Westerfield, but may be recovered—if awarded by a factfinder—against Smith.

## I. BACKGROUND

On March 1, 2016, Brandon fled arrest by Smith, a Laurel County Constable. Three days later, Smith received a tip about Brandon's whereabouts and went to the location—the A&B Market in East Bernstadt, Kentucky—to investigate. In attempting to arrest Brandon on

outstanding warrants[3] for failing to report to his probation officer in relation to a state drug-trafficking conviction, Smith ultimately shot and killed Brandon. A grand jury charged Smith with Second-Degree Manslaughter, and, after a two-day trial, a Laurel Circuit jury, in April 2017, convicted Smith of reckless homicide, a felony. DE 91-1 (*Commonwealth of Kentucky v. Bobby Joe Smith*, 16-CR-49). Video surveillance captured the shooting and much of the interaction, but still, the parties dispute how the events unfolded. Despite the state conviction, Smith maintains that his use of deadly force was justified. Stanley argues that it was not. He blames Smith but also Westerfield, the judge-executive, faulting his lack of oversight and control.

## II. STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

[3] The defense repeatedly mischaracterizes the warrants.

any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006). In the cross-

motion scenario, as here, each motion must pass through the analytical prism. The Court issues the relief justified by the record under the Rule 56 rubric.

## III. ANALYSIS

Judge Bunning previously summarized Plaintiff's claims as follows:

> Five claims have been asserted against Defendant Westerfield: violation of Stanley's rights under the United States Constitution (Count One), violation of Stanley's rights under the Kentucky Constitution and state Statutes (Count Two), negligent supervision (Count Four), negligent training (Count Five), and punitive damages (Count Six).
> . . .
>
> Plaintiff's Complaint asserts four claims against Constable Smith: violation of Stanley's rights under the United States Constitution (Count One), violation of Stanley's rights under the Kentucky Constitution and state statutes (Count Two), wrongful death (Count Three), and punitive damages (Count Six).

DE 25 at 2–3 & n.3. After Westerfield's 12(b)(6) efforts, two claims remain against him: the § 1983 official-capacity claim and the state-law personal-capacity claims for negligent supervision and training. *Id*. at 20. Smith did not seek claim dismissal under Rule 12. The Court will first address Plaintiff's claims against Smith.

### A. CLAIMS AGAINST CONSTABLE SMITH

#### 1. Stanley's Partial Motion for Summary Judgment

In his motion for summary judgment, Plaintiff Stanley argues that "Smith's conviction in the (state) criminal proceedings precludes him from denying liability for wrongful death and for causing the death of [Brandon] by actions which constituted a gross deviation from the standard of care that a reasonable person would observe in the situation as alleged in the matter before the court." DE 69-1 at 9–10. As discussed below, the Court agrees, because the requirements for collateral estoppel here exist. However, the real question posed by application of collateral estoppel is whether Smith's conviction allows for dispositive adjudication of Stanley's claims.

Stanley argues that "[g]iven the similarity in evidence in the past criminal action and the current civil case, the precedent for allowing offensive collateral estoppel under federal and Kentucky law, and to efficiently utilize judicial resources, the application of same to this case is clearly appropriate." *Id.* at 1. Stanley asks the Court to "hold that the guilty verdict resolves the key liability issues in the civil proceedings—that Smith shot Brandon Stanley and unreasonably caused his death." *Id.*

In this regard, it appears that, when exclusively considering his offensive motion for summary judgment, Stanley may only be asking the Court to determine the conviction should be given preclusive effect, not that such issue preclusion, in turn, warrants summary judgment in Plaintiff's favor. Smith seizes on this and responds that "Stanley failed to show the elements of the crime which Stanley was convicted of are identical to the elements of the civil complaint against him." DE 86 at 10. Smith urges that "Stanley's evidence does not show what the jury specifically found regarding the reasonableness of Smith's actions or that it considered the reasonableness of Smith's actions in the context of an excessive force claim." *Id*. at 14. This observation is fair enough; in his offensive briefing, Stanley does not attempt to show that the elements considered for the reckless homicide verdict align with the contours of the § 1983 excessive-force claim or establish requisite wrongful-death elements. However, in light of the full briefing and argued record, collateral estoppel conclusively applies.

To grant summary judgment against Smith on these claims on the basis of collateral estoppel, the criminal conviction must make it logically impossible for a reasonable juror— bound by the reckless-homicide verdict—to find for Smith on Stanley's excessive-force and wrongful-death claims. The conviction must likewise preclude Smith's entitlement to any form

of immunity. For the following reasons, the Court finds the state conviction mandates judgment for Stanley on his § 1983 individual-capacity claim and wrongful-death claim against Smith.

### a. *Collateral Estoppel Standard*

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 104 S. Ct. 892, 896 (1984). Non-mutual collateral estoppel has been viable under Kentucky law since at least 1970. *City of Covington v. Bd. of Trs. of the Policemen's & Firefighters' Ret. Fund*, 903 S.W.2d 517, 522 (Ky. 1995) (citing *Sedley v. City of West Buechel*, 461 S.W.2d 556 (Ky. 1970)). "Offensive [non-mutual] collateral estoppel refers to the successful assertion by a party seeking affirmative relief that a party to a prior adjudication who was unsuccessful on a particular issue in that adjudication is barred from relitigating the issue in a subsequent proceeding." *Id.* at 521. A court decides whether to apply offensive collateral estoppel on a case-by-case basis, bearing in mind that the doctrine may raise fairness concerns. *Parklane Hosiery Co. v. Shore*, 99 S. Ct. 645, 649–52 (1979) ("The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel."); *Revenue Cabinet v. Samani*, 757 S.W.2d 199, 202 (Ky. Ct. App. 1988).

In a federal § 1983 suit, a state-adjudicated issue is entitled to preclusive effect when it would have such effect in the courts of the state that rendered judgment. *Migra*, 104 S. Ct. at 897. Kentucky courts recognize that "a criminal conviction can be used for purposes of collateral estoppel in a later civil action." *Roberts v. Wilcox*, 805 S.W.2d 152, 153 (Ky. Ct. App. 1991); *see also England v. Laird*, No. 2007-CA-772-MR, 2008 WL 399758, at *6 (Ky. Ct. App. Feb. 15,

2008) (precluding civil defendant from re-litigating responsibility for individual's death in light of defendant's criminal conviction for murder). Use of the conviction in the civil case requires that the criminal judgment "finally dispose of the matters in controversy." *Gossage v. Roberts*, 904 S.W.2d 246, 248 (Ky. Ct. App. 1995).

Under Kentucky law, there are four essential elements of collateral estoppel: "(1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with the estopped party given a full and fair opportunity to litigate; [and] (4) a prior losing litigant." *Moore v. Cabinet for Human Res.*, 954 S.W.2d 317, 319 (Ky. 1997). The Court of Appeals of Kentucky has logically observed that the higher standard of proof and procedural safeguards of criminal proceedings provide additional support for giving preclusive effect to criminal convictions. *Koenigstein v. McKee*, No. 2002-CA-2212-MR, 2004 Ky. App. Unpub. LEXIS 1028, at *7–9 (Ky. Ct. App. Jan. 9, 2004). Moreover, preclusion is appropriate "when . . . the prior criminal proceeding 'involved a "serious offense" so that the defendant was motivated to fully litigate the charges.'" *Id.* at *9.

Here, the record is thorough as to the state criminal conviction. The record includes the trial itself, which features Smith's own trial testimony. It includes video surveillance of the shooting and witnesses' testimony. It includes the jury instructions and the jury verdict form, which required the jury to reach conclusions based on the same disputed facts now before the Court. Smith's arguments—that he did not violate an established right, or alternatively, that he acted reasonably and in good faith—imply the invalidity of his conviction, a position disallowed by collateral estoppel. *See Gossage*, 904 S.W.2d at 247–49. To the extent that a Kentucky jury has already decided the issues central to the claims against Smith now before the Court,

collateral estoppel requires that the verdict be given preclusive effect. Only the first and third elements of collateral estoppel require discussion.[4]

### b. Identity of Issues

An "identity of issues" exists between the inquiry underlying Smith's unsuccessful self-defense theory in the criminal case and the Fourth Amendment analysis that undergirds Stanley's excessive-form claim. For purposes of collateral estoppel, "[t]he key inquiry in deciding whether the lawsuits concern the same controversy is whether they both arise from the same transactional nucleus of facts." *Yeoman v. Commonwealth Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998).

Smith was originally indicted on a charge of Second-Degree Manslaughter. After a two-day trial, a Kentucky jury returned a guilty verdict, and the Laurel Circuit Court convicted Smith of Reckless Homicide. DE 91-1 at 2.

Stanley states:

> [D]etermination of whether Smith's actions were in self defense and whether they were reasonable given the situation that was faced by Smith was necessary to the outcome of the criminal trial. The criminal jury was faced with whether Smith was acting in self-defense. If so, then a not guilty verdict would have been rendered by the jury. Obviously, the jury rejected Smith's self-defense arguments and went on to consider whether he was guilty of Manslaughter in the Second Degree or Reckless Homicide. The jury found him guilty of Reckless Homicide as defined by the Jury Instructions. To do so, the Jury had to conclude that Smith's actions were a gross deviation from the standard of care that a reasonable person would observe in the situation.

---

[4] Westerfield attempts to defeat issue preclusion, as to him, under the third element, arguing that he did not have a full and fair opportunity to litigate the issues, as he was not involved in Smith's criminal trial. DE 85 at 4. As later discussed, the Court's decision (granting summary judgment in favor of Westerfield on all claims) does not turn on any application of collateral estoppel. The Court does not apply issue preclusion to Westerfield.

DE 91 at 5. This is not entirely correct. Though the Court agrees that the jury determined Smith's mistaken belief as to the necessity of self-defense was a gross deviation from the standard of care that a reasonable person would observe in the situation, it is not correct to say that the jury did not consider self-defense after rejecting it as an absolute defense. Rather, the jury accepted that Smith believed he was privileged to act in self-defense, but found that such belief was woefully mistaken. *See* DE 91-1 at 11 (Instruction No. 3A(C)(2): "Though otherwise privileged to act in self-protection the Defendant was mistaken in his belief that it was necessary to use physical force against Brandon Stanley in self-protection, or in his belief in the degree of force necessary to protect himself . . . ."). This granular distinction does not change the preclusive effect of the verdict and conviction, but the application of collateral estoppel requires precision. The Court clarifies.

Kentucky, by statute, defines the crime of reckless homicide:

(1) A person is guilty of reckless homicide when, with recklessness he causes the death of another person.

KRS 507.050. In the Commonwealth:

A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

KRS 501.020(4). In *Commonwealth v. Hasch*, 421 S.W.3d 349 (Ky. 2013), the Kentucky Supreme Court explained the two theories under which a defendant may be convicted of reckless homicide:

1) The so-called "straight" reckless homicide theory, where the defendant acts without the specific intent to kill and in doing so, fails to perceive a substantial and unjustifiable risk that his actions could cause the victim's death, *see* KRS 507.050(1) and KRS 501.020(4); and

2) The "imperfect self-defense" theory, where the defendant, with or without the specific intent to kill, acts under an actual but mistaken belief that he must use physical force or deadly physical force against another person in order to protect himself from imminent death or injury about to be inflicted by that person, and in so acting he failed to perceive a substantial and unjustifiable risk that he was mistaken in his belief that force is necessary. *See* KRS 501.020(4) and KRS 503.120(1).

*Id.* at 355–56. The *Hasch* Court expanded on the specific recklessness and reasonableness elements:

Under both theories of reckless homicide, the element of recklessness requires the failure to perceive a substantial and unjustifiable risk, and the failure to perceive that risk must be "a gross deviation from the standard of care that a reasonable person would observe in the situation." KRS 501.020(4). Under the straight theory of reckless homicide, KRS 507.050(1), a reckless failure to perceive the risk that the defendant's actions would result in the victim's death supplies the element of recklessness necessary to sustain a reckless homicide conviction.

Under the imperfect self-defense theory of reckless homicide, the defendant knows that his conduct could cause another person's death and he actually believes that the use of force is necessary to protect himself from another person. The element of recklessness is supplied by his failure to perceive a substantial and unjustifiable risk that his belief in the need to use force is mistaken. Again, the element of recklessness requires that the failure to perceive that risk was a gross deviation from the standard of care that a reasonable person would observe in the situation.

*Id.* at 356. In imperfect self-defense, the imperfection is in the fact and degree of mistaken belief. The actor using force is wrong in his belief about the need for force, but not just wrong. The actor must be wrong to a degree that demonstrates, objectively, the gross failure to perceive a substantial and unjustifiable risk of mistake. In other words, not just wrong, dead wrong.

Here, as indicated by the signature of the jury foreperson on the verdict form, the jury found Smith guilty under the imperfect self-defense theory of reckless homicide. DE 91-1 at 9–13 (Jury Instructions and Verdict Form). Thus, contrary to Stanley's assertion that the jury rejected the self-defense theory outright, the jury instead found that Smith was mistaken as to either the necessity of physical force or the degree of physical force required to defend himself

from Brandon. The Kentucky Supreme Court has further explained the two varieties of mistaken belief in this context:

> The reckless homicide conviction can be sustained under the imperfect self-defense theory only if the evidence adduced at trial could lead reasonable jurors to believe beyond a reasonable doubt that Appellee failed to perceive the risk that she was mistaken in her belief that she needed to act in self-protection or in the degree of force necessary.

> Under KRS 503.120(1), the mistaken belief can take either of two forms. There may be a mistaken belief that force of any kind was needed. For example, one might mistake an innocent, friendly visitor for a dangerous intruder. Or, there may be a mistaken belief that deadly force rather than non-deadly force was needed for self-protection. For example, one might mistakenly believe that an unarmed aggressor was about to strike with a deadly weapon or dangerous instrument.

*Hasch*, 421 S.W.3d at 358 (internal citation omitted). The verdict form shows that the jury convicted Smith on the imperfect self-defense theory; it does not establish whether the jury found Smith was mistaken as to the need for force as opposed to the degree of force necessary. That uncertainty does not prevent the Court's application of collateral estoppel. *Hasch* reiterated the recklessness component under either theory:

> In either case, to be "reckless," the failure to perceive the risk of being mistaken must be "a gross deviation from the standard of care that a reasonable person would observe in the situation."

*Id*. Therefore, as in *Hasch*, "[b]ecause there was no doubt in this case that [Smith] intentionally fired the fatal bullet, when the jury convicted [Smith] of reckless homicide . . . it accepted [his] claim that [he] actually believed [his] use of force was necessary to prevent [Brandon] from hurting [him]. Further, it had to conclude that [Smith] was mistaken in that belief, and that [he] was reckless in forming that mistaken belief." *Id.* at 356.

### c. *Necessary Issue with a Fair and Full Opportunity to Litigate*

Because Smith proceeded on a self-defense theory (which the jury essentially rejected), the jury's findings and verdict concerning Smith's recklessness were necessary to the outcome, a

conviction for reckless homicide. Moreover, because Smith took full advantage of a criminal jury trial, the jury decided the issue of Smith's culpability only after he had a fair and full opportunity to litigate. The Sixth Circuit once observed (albeit in the bankruptcy context), that "[c]ollateral estoppel is applied to encourage the parties to present their best arguments on the issues in question in the first instance and thereby save judicial time." *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir. 1981). Another description of collateral estoppel (likewise from a bankruptcy case) is similarly instructive: "An issue that was actually litigated and was necessary to the judgment will almost always present parties with a full and fair opportunity to litigate." *Trost v. Trost*, 735 F. App'x 875, 881 (6th Cir. 2018). And, as the Kentucky Court of Appeals noted in *Koenigstein*, the beyond-a-reasonable-doubt standard, the procedural protections in criminal proceedings, and the seriousness of criminal charges further justify the application of collateral estoppel. 2004 Ky. App. Unpub. LEXIS 1028, at *7–9. Smith, after all, faced prison on a felony conviction; the stakes assured vigorous investment by him in the criminal case.

Here, there is no reason to believe that Smith did not present his "best arguments" when facing a Second-Degree Manslaughter charge for Brandon's death. In Kentucky, Second-Degree Manslaughter is a Class C felony, punishable by at least five but no more than ten years of imprisonment. KRS 507.040; KRS 532.020. Smith's theory was self-defense, which was presented to the jury and effectively rejected by its verdict. Stanley forcefully argues, based on the fact of the criminal jury trial and the presentation of Smith's evidence (including his own testimony at trial), that Smith had a full and fair opportunity to litigate. *See* DE 69 at 8; DE 91 at 6. In contrast, Smith tailors his collateral-estoppel arguments to the "identity of issues" element rather than the "full and fair opportunity" element. *See* DE 86 at 10–15. In sum, the issue of Smith's culpability—which depended on the jury's findings as to Smith's recklessness and

(inherently) the reasonableness of his use of deadly force against Brandon—was ultimately and necessarily decided by the jury in the criminal proceeding. The Court gives full faith and credit to the result.

### d. *Conclusions as to Collateral Estoppel*

Smith is collaterally estopped from relitigating that Smith recklessly caused Brandon's death and that Smith was mistaken—and recklessly so—as to the necessity or degree of physical force required for self-defense. Smith's mistaken belief was "a gross deviation from the standard of care that a reasonable person would have observed in the same situation." DE 91-1 at 11. The Court bases this finding on the complete criminal record, which establishes the evidence considered and the issues conclusively decided. The Court, with that finding, proceeds to its summary judgment analysis.

## 2. § 1983 Claims Against Smith

### a. *Summary Judgment Granted for Stanley*

Having analyzed the issues subject to collateral estoppel by the criminal conviction, the Court assesses whether those issues resolve, as a matter of law, Stanley's § 1983 claim, thereby allowing summary judgment. The Court finds adjudication proper and grants summary judgment for Stanley on his § 1983 individual-capacity claim against Smith.[5]

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged violation was

---

[5] Stanley sued Smith in his official and individual capacities. *See* DE 15 (Amended Compl.) (stating complaint against Smith "individually and in his capacity as Laurel County Constanble [sic]"). Smith does not make any arguments about the official-capacity claims. Consistent with Judge Bunning's analysis as to Westerfield, the Court would treat any official-capacity claim against Smith, a county official, as a claim against the County itself. *See* DE 25 at 7. Without briefing or argument on that discrete theory, the claim thus persists.

committed by a person acting under color of state law." *West v. Atkins*, 108 S. Ct. 2250, 2255 (1988); *Miller v. Sanilac Cty.*, 606 F.3d 240, 247 (6th Cir. 2010).

In this case, there is no plausible dispute that Smith was acting under color of state law. He so admits. DE 35 (Answer) ¶ 13. The United States Supreme Court has held that acting under color of state law requires that the defendant in a § 1983 action have exercised the power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Redding v. St. Eward*, 241 F.3d 530, 533 (6th Cir. 2001) (quoting *West*, 108 S. Ct. at 2255). While the parties disagree about the liability of a constable as well as the scope of a constable's authority, they do not dispute that Smith was acting under color of state law. *See, e.g.*, DE 81 at 4 ("Smith was allowed to operate within the County as a law enforcement agent and was only covered by a bond of $10,000 for insurance purposes."); DE 67-1 at 15 ("[C]onstables occupy a categorically different position than other law enforcement officers."). Nor could they suggest otherwise. Therefore, the only question is whether Brandon was "deprived of a right secured by the Constitution or the laws of the United States." *See Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir. 1998).

As against Smith, Stanley alleges, in this context, a Fourth Amendment excessive-force violation.[6] An excessive-force claim "is most properly characterized as one invoking the

---

[6] In the Court's prior order, Judge Bunning construed the § 1983 claim as alleging a Fourth Amendment violation, because the conduct occurred "during the arrest or seizure of Stanley." DE 25 at 5. In a footnote, he explained that "[t]he Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens . . . while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons. When a citizen does not fall clearly within either category . . . the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force." *Id.* at 5 n.8 (internal citations omitted).

The Sixth Circuit has acknowledged that a claim of excessive force can be raised under the Fourth, Eighth, or Fourteenth Amendments. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir.

protections of the Fourth Amendment, which guarantees citizens 'the right to be secure in their persons . . . against unreasonable . . . seizures.'" *Graham v. Connor*, 109 S. Ct. 1865, 1871 (1989) (internal citation omitted). "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Id.* (internal citations omitted). The "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 105 S. Ct. 1694, 1699 (1985).

The Supreme Court has stated that:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failure to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, non-dangerous suspect by shooting him dead[.]

*Id.* at 1701. To satisfy the Fourth Amendment, a law-enforcement officer's use of force must have been objectively reasonable under the circumstances. *Id.* at 1699–1700. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 109 S. Ct. at 1871 (quoting *United States v. Place*, 103 S. Ct. 2637, 2642 (1983)).

"Given the extreme intrusion caused by use of deadly force, the countervailing governmental interests must be weighty indeed; 'only in rare instances may an officer seize a suspect by use of deadly force.'" *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (quoting *Whitlow v. City of Louisville*, 39 F. App'x 297, 302–03 (6th Cir. 2002)). The Fourth

2013). The Fourth Amendment protects free citizens from excessive force in its prohibition against unreasonable seizures. *Id.*

Amendment objective-reasonableness inquiry applies whether or not a case involves the use of deadly force; "however, the use of force will be deemed reasonable when 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" *Bell v. Cumberland Cty.*, 665 F. App'x 421, 425 (6th Cir. 2016) (quoting *Garner*, 105 S. Ct. at 1701); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009). "The critical question is whether a reasonable officer in the defendant's position would have had probable cause 'to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others.'" *Zulock v. Shures*, 441 F. App'x. 294, 302 (6th Cir. 2010) (internal citation omitted). "Absent such probable cause, however, a police officer may not seize a fleeing felon by employing deadly force." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007).

The Sixth Circuit, obeying *Graham*, "has used the following factors to evaluate whether an officer's actions are reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006).

Here, Smith, himself seeking summary judgment, argues that these factors require a finding that his actions were reasonable under the circumstances:

> The undisputed evidence shows that like the suspect in *Mitchell* [*v. Schlabach*, 864 F.3d 416 (6th Cir. 2017)], Stanley had done the following things: on March 1, 2016 – Stanley possessed a knife and reached for the knife when he tried to pull away from Smith; on March 4, 2016 – Stanley lunged towards Smith in the poker room creating the impression in Smith that Stanley was going for Smith's gun; Stanley would not comply with Smith's lawful orders; Stanley did not recognize Smith's constable status as authority; Stanley said Smith was not going to arrest him; Stanley said he was going to leave the Store dead or alive indicating he was willing to do whatever it took to get out of the Store; Stanley positioned two items in his hands while not revealing what was in his hands as he approached Smith;

and most importantly, Stanley continued to approach Smith despite repeated warnings to get on the ground and the fact Smith had a gun trained on him. Likewise, the undisputed evidence shows Smith never heard Stanley say that he was unarmed. Furthermore, Stanley continued to proceed towards Smith even after Smith retreated from him. The evidence also shows Stanley appeared to be under the influence of narcotics at the time of his confrontation with Smith and Stanley was acting erratically. Also, the evidence clearly indicates Stanley was concealing a silver colored object in his hand which Smith and another witness reasonably believed to be a weapon.

DE 71-2 at 19. Smith's argument misses the point and ignores history. Twelve jurors—hearing those facts[7]—rejected Smith's self-defense argument and found him guilty of reckless homicide on an imperfect self-defense theory. Again, that conviction required the jury to find, beyond a reasonable doubt, that Smith's failure to perceive the substantial and unjustifiable risk of being mistaken (in either his belief that he needed to act in self-protection or in the degree of force necessary) was "a gross deviation from the standard of care that a reasonable person would observe in the situation." *See* DE 91-1 at 11.

That the jury did not expressly conduct a weighing of the *Graham* factors does not impede the Court under these specific circumstances. A federal jury, bound by the state jury's finding, could not reasonably find that Smith had probable cause to believe that Brandon Stanley posed a threat of severe physical harm. To be clear: "This circuit has made the threat factor from *Graham* a minimum requirement for the use of deadly force: such force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm, either to the officer or others." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). Probable cause means "a 'reasonable ground for belief.'" *United States v. Pruitt*, 458 F.3d 477,

---

[7] The Court has thoroughly reviewed excerpts from the trial transcript; the jury considered the same evidence. *See, e.g.*, DE 82-9 at 24–25. The video of the incident was a key trial focus.

490 (6th Cir. 2006) (quoting *Ybarra v. Illinois*, 100 S. Ct. 338, 342 (1979)). Specific to this context:

> "Probable cause," while "incapable of precise definition," means that the facts and circumstances of which the officer is aware and are reasonably viewed as accurate are "sufficient unto themselves to warrant a man of reasonable caution to believe that" deadly force is necessary.

*Davenport*, 521 F.3d at 551 (internal citations omitted). The state jury, considering the same *Graham*-type evidence Smith here touts, found that Smith was wrong in his belief about the need for force. It found Smith not just wrong, not just unreasonably wrong, but wrong to a reckless degree. It would not be possible for Smith both to be recklessly wrong, as adjudicated, and to have probable cause on the lynchpin threat belief. The state verdict forecloses the possibility and thus precludes the potential that Smith did not use excessive force.

Smith maintains that the analysis required to find a Fourth Amendment violation differs from the reckless-homicide conviction. Specifically, he argues that, when determining § 1983 liability, "an action's reasonableness must be judged 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *See* DE 71-2 at 13 (quoting *Graham*, 109 S. Ct. at 1872). Further, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. (quoting *Sigley*, 437 F.3d at 534). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case." *Id*. (quoting *Graham*, 109 S. Ct. at 1872).

However, the fact that the jury convicted Smith of reckless homicide on the imperfect self-defense theory means that the jury considered Smith's conduct from both a subjective and

objective standpoint, aligning it with the reasonableness analysis in the use-of-force context. The Kentucky Supreme Court explained:

> As provided by the statutory language, the "mistaken belief" component of reckless homicide under the imperfect self-defense theory is based upon the defendant's subjective viewpoint: a defendant must actually believe, albeit mistakenly, that the use of deadly force is necessary. But, whether the defendant's failure to perceive the risk of being mistaken was a gross deviation from the standard of care must be based upon an objective viewpoint—what a reasonable person would perceive in the situation.

*Hasch*, 421 S.W.3d at 358. In arriving at the reckless-homicide conviction, the jury considered whether—for a reasonable person in Smith's position, under the situation as it developed, and not from 20/20 vision of hindsight—Smith had a mistaken but non-reckless belief that use of deadly force was necessary. The jury concluded that Smith's erroneous belief (either as to the need for self-defense or the degree of force required) was "a gross deviation from the standard of care that a reasonable person would observe in the situation." *See* DE 91-1 at 11. In other words, the jury found that it was objectively unreasonable, nay, reckless, for Smith to believe that deadly force was necessary under the circumstances.[8] The Court rejects the notion that there is consequential daylight, at least on these facts, between the determination of unreasonableness required to arrive at a reckless-homicide conviction (on an imperfect self-defense theory) and the finding of (implicitly reasonable) probable cause required to overcome a Fourth Amendment excessive-force claim. The criminal case jury found a gross deviation beyond a reasonable doubt; a civil jury, looking at the same scenario but bound by the state verdict, could not find that Smith

---

[8] In a related declaratory-judgment action, the Sixth Circuit affirmed this Court's earlier rejection of the logical possibility of force that is both reasonable *and* unnecessary. *See Atl. Specialty Ins. Co. v. Stanley*, No. 19-5259, 2019 WL 4440402, at *5 (6th Cir. 2019) ("[I]t would be illogical to conclude in this case that Smith used reasonable—but unnecessary—force when he shot and killed Brandon. We agree with the district court that '[a]n unnecessary constabulary use of force is one inherently unreasonable.'").

reasonably believed he had justification to kill Brandon. Accordingly, the Court grants Stanley summary judgment on his § 1983 individual-capacity claim against Smith.

### b. *Federal Qualified Immunity Does Not Bar Judgment*

Collateral estoppel again carries the day: Smith's reckless-homicide conviction establishes, as a matter of law, that Smith unreasonably violated a clearly established right, and thus, defeats federal qualified immunity.

The qualified-immunity inquiry proceeds in two steps:

> Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights. A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense. At the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a "genuine issue of fact," that is, "evidence on which [a] jury could reasonably find for the plaintiff."

*McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (internal citations omitted). Here, Smith undoubtedly seized Brandon by shooting him twice, thus implicating the Fourth Amendment. Smith's reckless-homicide conviction logically contains the jury's determination that Smith was grossly unreasonable in his decision to employ deadly force under the circumstances. As a result, a reasonable juror could come to no other conclusion than that a Fourth Amendment violation occurred.[9]

The second step of the qualified-immunity inquiry asks whether the violated constitutional right was clearly established. Smith argues that his use of deadly force did not violate any clearly established right:

---

[9] Smith's effort at summary judgment ignores the state proceedings and is an affront to the comity and import of full faith and credit. To boldly contend that, despite the state result, there is not even a factual question on the propriety of Smith's actions renders the motion non-serious.

The Defendant is not aware of any Sixth Circuit based case law that would have required Smith to do something other than what he did on the date in question with regard to Stanley. Specifically, Smith is not aware of any case law that would establish it is unconstitutional for an officer to use deadly force against a suspect who did the following things: 1) possessed a knife and reached for the knife when encountered by the law enforcement officer only days before the officer used deadly force; 2) lunged towards the officer in such a manner as to create the impression the suspect was going for the officer's gun; 3) failed to comply with the officer's lawful orders; 4) would not recognize the officer's constable status as authority; 5) said the officer was not going to arrest him; 6) said he was going to leave the scene of the arrest dead or alive indicating the suspect was willing to do whatever it took to get away; 7) concealed two items, one of which was metallic and appeared to the officer to be a weapon, while not revealing what was in his hands as he approached the officer; and 8) continued to approach the officer despite repeated warnings to get on the ground and the fact the officer had a gun trained on him.

DE 71-2 at 23. Smith's heavily interpretive treatment ignores the Court's obligation to view the facts in the light most favorable to Stanley. *See Scott v. Harris*, 127 S. Ct. 1769, 1774–75 (2007). The contentions further reveal that Smith implicitly challenges the jury's findings underlying his criminal conviction. But collateral estoppel precludes this effort, and qualified immunity does not furnish an alternative vehicle for the impermissible strategy.

In a typical case, when "the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). For example, when there is a factual dispute over the reasonableness of the use of deadly force, summary judgment based on qualified immunity is improper. *Id.* ("This is because the reasonableness of the use of force is the linchpin of the case."). But this is not a typical case. The Court need not imagine how a hypothetical jury would view the competing factual narratives of Stanley and Smith and whether such a jury could determine that Smith's use of force was unreasonable. A real-life jury already listened to the entire story—which included Smith's theory of self-defense—and determined that Smith was unjustified in killing Brandon. Specifically, the jury concluded that Smith recklessly entertained

a mistaken belief about the necessity of self-defense and so caused Brandon's death. Smith committed criminal homicide.

Smith's qualified-immunity argument is meritless. The Sixth Circuit has often repeated that "individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006)); *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011); *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991); *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)) (internal quotation omitted); *see also Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) ("[I]t is axiomatic that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[] a threat of serious physical harm, either to the officer or to others."); *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005). Accordingly, Smith violated a clearly established right of Brandon and is not entitled to qualified immunity.

### 3. Individual-Capacity Wrongful-Death Claim

#### a. *Summary Judgment (as to Liability) Granted for Stanley*

Smith's reckless-homicide conviction establishes, as a matter of law, liability for Brandon's wrongful death. Kentucky courts have recognized that a criminal conviction can conclusively determine civil liability in a subsequent wrongful-death action. *See England*, 2008 WL 399758, at *6 ("Thus, we agree with the trial court that England's conviction for murder precludes him from re-litigating his liability for Halvorson's death in this civil action."); *Jones v. Warren*, No. 2010-CA-218-MR, 2012 WL 2945614, at *3 (Ky. Ct. App. July 20, 2012) ("Where a defendant has been convicted of murder in a criminal action, the defendant is generally

precluded from relitigating the issue of his liability for the victim's death in a wrongful death action and, thus, liability is fixed against defendant in such wrongful death action.").

As a logical matter, a reckless-homicide conviction entails a more culpable mental state—tested by a higher burden of proof—than required for wrongful death. Kentucky's wrongful-death statute provides:

> Whenever the death of a person results from an injury inflicted by the *negligence or wrongful act of another*, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased.

KRS 411.130(1) (emphasis added). A "wrongful death claim . . . is, at its core, a tort claim based upon negligence." *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016). Negligence consists of a failure to exercise ordinary care under the circumstances whereas recklessness involves "conscious indifference." *Hoke v. Cullinan*, 914 S.W.2d 335, 339 (Ky. 1995). Recklessness necessarily establishes the requisite negligence element of wrongful death. *See id.* (finding that recklessness establishes negligence, but not the other way around). No party contests causation. Accordingly, all but the damages amount (and any punitive award) is established as a matter of law.

### b. No Kentucky Qualified Official Immunity Bar

Kentucky qualified official immunity does not prevent summary judgment on Stanley's wrongful-death claim. Though similar, the Kentucky immunity analysis is distinct from federal qualified immunity. Under Kentucky law, "when sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). The Kentucky Supreme Court has explained that, in

the context of qualified immunity, a finding of "'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known . . . *i.e.* objective unreasonableness[.]" *Id.* at 523. "Once the officer or employee has shown prima facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id.*

Smith states that he is entitled to qualified official immunity under Kentucky state law, because "the undisputed evidence in this case shows Smith's use of force against [Brandon] was in good faith." DE 71-2 at 26. A Kentucky jury surely determined otherwise. The right to not be shot by law enforcement, absent probable cause, is clearly established. *King*, 694 F.3d at 664. Further, Kentucky law defines the parameters of justified force. KRS 503.120(1). A jury found that Smith's mistake as to the use of deadly force was "a gross deviation from the standard of care that a reasonable person would observe in the situation." *See* DE 91-1 at 11. The reckless-homicide conviction establishes that Smith violated the reckless-homicide statute and Brandon's clearly established rights. No reasonable fact finder could consistently find that Smith acted with the good faith required under qualified official immunity. *See Bouggess*, 482 F.3d at 897 (finding bad faith and denying state official qualified immunity when officer's actions clearly amounted to unauthorized use of deadly force in violation of the Fourth Amendment). The concept of good faith includes the concept of objective reasonableness, and the recklessness of Smith's belief, at the time of the shooting, signals both his criminal act and the absence of good faith for immunity purposes. *See Bryant v. Pulaski Cty. Det. Ctr.*, 330 S.W.3d 461, 467 (Ky. 2011) ("At the heart of either good or bad faith is the element of belief or knowledge."); *id.* (discussing concept in context of whether actor both "honestly" and "reasonably believed" in propriety of action).

Smith, a lawman, surely carried with him the presumptive knowledge of Kentucky's criminal laws and proper force parameters. His belief as to actions taken on the fateful day was not, the record conclusively shows, objectively reasonable. Accordingly, the Court finds Smith is not entitled to qualified official immunity as to Stanley's wrongful-death claim.

### 4. Kentucky Constitutional Claims

To the extent Stanley seeks to allege violations of the Kentucky Constitution that lack corresponding statutory causes of actions, the Court grants summary judgment for Smith. As Judge Bunning stated when addressing Plaintiff's claims against Westerfield:

> The contours of [Plaintiff's] state-constitutional claim are unclear. Plaintiff neither cites to specific sections of the Kentucky Constitution nor provides details from which the Court could ascertain which provisions of the Kentucky Constitution have allegedly been violated. Therefore, the Court is left reading tea leaves with respect to this claim.[10]
> . . .
> [T]here is [no] analogue to § 1983 under Kentucky law. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534–38 (Ky. 2011) (holding that neither the Kentucky Constitution nor any Kentucky statute "create[s] a private right of action for violations of the state constitution" and refusing to judicially create a constitutional tort for state-constitutional violations).

DE 25 at 15–16. Moreover, Stanley failed to address Smith's summary-judgment motion as to the state constitutional claims and thus abandoned this count. *Hicks v. Concorde Career College*, 449 F. App'x 484, 487 (6th Cir. 2011).

## B. CLAIMS AGAINST WESTERFIELD

"The only claims [against Westerfield] that have not been dismissed are: (1) Plaintiff's § 1983 claim against Defendant Westerfield in his official capacity and (2) Plaintiff's state-law claims for negligent supervision and training against Defendant Westerfield in his personal

---

[10] Smith suggests that "[b]ased upon the factual allegations in the Complaint, the Plaintiff's state constitutions [sic] may have been brought under either Section 2 or Section 10 of the Kentucky Constitution." DE 71-2 at 24.

capacity." DE 25 at 20. For the following reasons, the Court grants summary judgment for Westerfield as to Stanley's individual-capacity state-law claims and as to the § 1983 official-capacity claim.

### 1. State-Law Claims (Individual Capacity, Failure to Supervise or Train)

Westerfield argues that he had no duty to supervise or train a constable. *See* DE 67-1 at 5–10 ("It is axiomatic that in order for Westerfield to be liable for Plaintiff's state-law negligent supervision and negligent training claims, Westerfield must first have had a duty to train and supervise Smith."). Alternatively, he argues he is entitled to qualified official immunity under Kentucky law, because his conduct constituted good-faith performance of discretionary functions. The Court considers both in turn.

#### a. Role of the Constable

Neither party demonstrates clear understanding of the office of a county constable in Kentucky. Who, or what entity, is ultimately responsible for a constable's conduct? *Compare* DE 81 at 7 ("[A] Judge-Executive has both the ability and the duty to exercise control over the actions of Constables."), *with* DE 67-1 at 7("[E]lected officials . . . are not supervised by the fiscal court . . . ."). Is a constable a county employee? *Compare* DE 81 at 7 (yes), *with* DE 67-1 at 6, 7 (no). The parties cite to statutes, case law, and attorney general opinions and analogize to other law-enforcement officials to provide authority in support of mutually exclusive positions.[11]

In Kentucky, the county constable is an elected office created by the state Constitution.

> At the regular election in nineteen hundred and ninety-eight and every four years thereafter, there shall be elected in each county a Judge of the County Court, a County Court Clerk, a County Attorney, Sheriff, Jailer, Coroner, Surveyor and

---

[11] The office of constable is subject to particular debate. *See, e.g.*, Andrew Fulkerson, *If the Constable Blunders, Does the County Pay? Liability Under Title 42 U.S.C. § 1983*, 28 U. Ark. Little Rock L. Rev. 519 (2006).

Assessor, and in each Justice's District one Justice of the Peace and one Constable, who shall enter upon the discharge of the duties of their offices on the first Monday in January after their election, and who shall hold their offices four years until the election and qualification of their successors.

Ky. Const. § 99. The Kentucky Constitution further requires that constables have "the same qualifications as Sheriffs" and gives constables jurisdiction over the counties where they reside. *Id.* § 101. By statute, "[c]onstables may execute warrants, summons, subpoenas, attachments, notices, rules and orders of court in all criminal, penal and civil cases, and shall return all process placed in his hands to the courts or persons issuing them." KRS 70.350(1).

Though constables are "peace officers" within the meaning of Kentucky law, KRS 446.010(31), another provision exempts constables from state law-enforcement certification[12] requirements. *See* KRS 15.380(5)(c). The statute has a three-part scheme by which certain officers *must* be certified, other officers *may* be certified "upon request of the employing agency," and still others "*shall be exempted* from the certification requirements" unless the officer himself requests certification. *See id.* (emphasis added) Constables fall within this third category. *Id.*

Against this constitutional and statutory background, Stanley argues that Westerfield is liable for his failure to properly supervise and train Smith as Laurel County constable. *See* DE 15 (Counts Four and Five). The primary problem with this claim—and part of the basis for Westerfield's entitlement to summary judgment on this count—is that Stanley has not alleged or supported a viable theory of liability. In response to Westerfield's motion for summary judgment, Stanley asserts that he has demonstrated a sufficient statutory basis for Westerfield's

---

[12] Certification includes verification of certain attributes, objective and otherwise, and further involves a minimum training requirement. KRS 15.382; KRS 15.404. Failure to secure proper training results in loss of certification. *See id.* Those rules do not apply to constables.

authority to supervise and train Smith. *See* DE 81. Namely, Stanley points to Westerfield's oversight related to the swearing-in of constables, the bond-approval process for constables, the investigation of county activities, the employment of personnel in performance of police and fire protection, the provision of information about county operations to the fiscal court, and the power to make vacated or removed constables "return and account for all claims, processes and papers in his hands." *Id.* (quoting KRS 70.340).  But this patchwork of statutory provisions, largely clerical in nature, does not suggest that, as judge-executive, Westerfield had any responsibility or power to supervise or train Smith in carrying out his duties as constable, a constitutionally rooted role.

Stanley largely points to the county's bonding control as a vehicle for constable regulation. The Court notes, though, that the Constitution of Kentucky establishes the position as an elective county office. Further, the General Assembly chose to define the powers of the office as it did and chose also to exempt constables from the certification and training requisites almost all other law enforcement officers must meet. A county's ability to demand a bond higher than the $10,000 statutory floor, *see* KRS 70.310(1), could impact whether a constable serves. That indirect influence is hardly a mandate to train, manage, and supervise the independent law-enforcement functions, such as they are, of the coequal constable. Stanley, facing a summary-judgment motion, cites to no Kentucky law empowering a judge-executive to demand or require particular training or conduct by a constable. Stanley's own expert disclaimed any actual control by a judge-executive in this context. *See* DE 67-2 at 5 (Dr. Cox Depo) (denying that Westerfield could have removed Smith from his position or demanded additional training). The expert saw the economic leverage of the bond as the judge-executive's lone play. That is a slender liability reed in this case.

### b. State Qualified Official Immunity Bars

As a county official, a judge-executive, in his or her individual capacity, enjoys qualified immunity for "the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, (2) in good faith; and (3) within the scope of the employee's authority." *See Yanero*, 65 S.W.3d at 522 (internal citations omitted).

As Westerfield notes, "[t]he Court has already ruled that '[s]upervision and training are discretionary functions, which the Plaintiff alleges are within Defendant Westerfield's scope of authority.' Accordingly, the Plaintiff must show Westerfield acted in bad faith in failing to train or supervise Smith." DE 67-1 at 13 (internal citations omitted) (quoting DE 25 at 18). As earlier noted, "'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523. Thus, unlike federal law, Kentucky law adopts both objective and subjective approaches to qualified immunity. *See Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F.Supp.2d 654, 663–64 (W.D. Ky. 2013).

"[I]mmunity is more than just a defense; it alleviates the employee's or officer's need even to defend the suit, which is to be dismissed." *Marson v. Thomason*, 438 S.W.3d 292, 297–98 (Ky. 2014). Once an officer or employee raises qualified official immunity as a defense, it is the plaintiff's burden to show that the defendant did not perform the act in good faith. *Yanero*, 65 S.W.3d at 523.

Here, Stanley has failed to sufficiently demonstrate a question of fact as to whether Westerfield acted in bad faith in failing to train or supervise Smith. Even viewing the facts in the light most favorable to Stanley, he appears to allege that Westerfield acted in bad faith by failing to comply with duties that Kentucky law does not actually impose. Stanley, who attributes no subjective animus in Westerfield, cites to no constitutional, statutory, or regulatory source, relative to constable authorization or management, that Westerfield breached. He points to no interaction between Westerfield and Smith that would have notified Westerfield of a pattern of misbehavior or risk. The record does not indicate that Westerfield knew any details of Smith's performance, practices, or role. Given Smith's status as a constitutionally required county officer, Stanley has wholly failed to demonstrate a basis for finding that Westerfield, by simply following the statutes and constitutional provisions on the constabulary office, and performing minor administrative functions for the fiscal court, acted in bad faith, or in an objectively unreasonable way (as defined by the cases) relative to Brandon's known rights.

## 2. § 1983 Municipal Liability

"Since a suit against a state official in . . . official capacity is regarded as a suit against the state, it seems logical to regard a suit against a County official in . . . official capacity as a suit against a County." *Smallwood v. Jefferson Cty. Gov't*, 743 F. Supp. 502, 503 (W.D. Ky. 1990) (internal citation omitted); DE 25 at 7 (Per Judge Bunning: "Because Plaintiff's suit against Defendant Westerfield in his official capacity as Laurel County Judge-Executive is, 'in all respects other than name, to be treated as a suit against the entity'—Laurel County—the Court will analyze this claim as one for municipal liability under § 1983.") (internal quotation omitted).

In context of an individual's action, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 106 S. Ct. 1292, 1299 (1986). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* at 1300.

Here, as explained in the context of Stanley's state-law claims against Westerfield, Stanley fails to point to any statute, precedent, or proof indicating that Westerfield was the final county policymaker for issues related to the constable—including supervision and training. Indeed, beyond bond-setting,[13] Stanley suggests no actual Westerfield authority to regulate Smith. Absent such regulatory power, Westerfield's acts or omissions could not create county policy for constabulary matters. *See Shorts v. Bartholomew*, 255 F. App'x 46, 57 (6th Cir. 2007) ("A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question*."); *McClain v. Cornett*, No. 05-372-GFVT, 2007 WL 9736088, at *3 (E.D. Ky. Mar. 29, 2007) ("As the elected official in charge of the Letcher County Jail, a reasonable juror could find that Cornett makes final governmental policy *with regards to the jail*.") (emphasis added); *see also Pembaur*, 106 S. Ct. at 1300; *Sartaine v. Pennington*, 410 F. Supp. 2d 584, 591 (E.D. Ky. 2006), *aff'd*, 244 F. App'x 718 (6th Cir. 2007). Further, given that Smith's training—or lack thereof—and the manner of warrant execution were constabulary

_____

[13] KRS 70.310, though suggesting a county could require a higher bond than the $10,000 minimum, does not clearly put authority on the question in the judge-executive's hands. The statute does repeatedly cite the fiscal court, *e.g.*, as the entity recording the bond, approving sureties, and controlling bond renewal. *See id.* at (1)–(3). The judge and fiscal court are not interchangeable parts for purposes of § 1983 analysis.

matters, there is no nexus between any misfeasance or nonfeasance within Westerfield's sphere of policymaking authority and this shooting.

Because the Court construes the official-capacity claim to denote a theory of county liability premised on Westerfield's supervisory acts or omissions, and because the Court sees no viable claim on that basis, the Court likewise grants Westerfield summary judgment on this claim.[14] As Plaintiff facing the burden, Stanley falls woefully short of linking Westerfield to § 1983 county liability.[15]

### C. Punitive Damages

As there are no remaining claims against Westerfield, the Court grants Westerfield summary judgment on the issue of punitive damages. The Court, for this claim, denies Smith summary judgment. Punitive damages are available in a § 1983 individual-capacity suit, *see Kentucky v. Graham*, 105 S. Ct. 3099, 3106 n.13 (1985), and as a remedy for wrongful death, *see*

---

[14] However, the official-capacity claim against Smith persists. *See* DE 15 (Count One) ("Defendants, under color of state law, deprived Stanley's rights, privileges and immunities secured by the United States Constitution including without limitation the Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments thereto."). No Defendant presents an argument for summary judgment on this claim, and the Court sees no basis to dismiss the claim sua sponte. *See Pembaur*, 106 S. Ct. at 1299. To the extent Stanley included an official-capacity claim against Smith under state law, the same immunity would bar that claim as barred the Westerfield official-capacity state theories. *See* DE 25, at 16–17 (Judge Bunning dismissing on sovereign immunity).

[15] This is without analyzing the strenuous deliberate-indifference hurdle that would be part of any substantive analysis irrespective of authority to regulate. *See City of Canton v. Harris*, 109 S. Ct. 1197, 1204–05 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); *Ciminillo*, 434 F.3d at 469 ("In order to establish a failure-to-train claim, [the plaintiff] must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury.").

KRS 411.130(1) ("If the act was willful or the negligence gross, punitive damages may be recovered.").

## IV. CONCLUSION

The Court orders as follows:

1. The Court **GRANTS** DE 67, Westerfield's motion for summary judgment;

2. The Court **DENIES AS MOOT** DE 68, Stanley's motion to exclude;[16]

3. The Court, as to liability, **GRANTS** DE 69, Stanley's motion for summary judgment. As to damages, those questions are for the jury;

4. The Court **DENIES AS MOOT** DE 70, Smith's motion to exclude;

5. The Court **GRANTS IN PART** and **DENIES IN PART** DE 71, Smith's motion for summary judgment;

6. The Court **DENIES AS MOOT** DE 73, Westerfield's motion to exclude;

7. The Court **GRANTS** DE 100, Smith's motion for leave to file a surreply;

8. The Court **DENIES** DE 103, Stanley's motion for leave to file a reply to Smith's surreply; and

9. The Court will set a status conference (for evaluation of future case steps) by separate order.

This the 30th day of September, 2019.

---

[16] Because this Order disposes of all liability issues, the Court treats the *Daubert* motions as moot. Each of the experts addressed liability, chiefly the propriety of Smith's use of force. Because the Court has ruled on that, as a matter of law, the Court sees no need to address admissibility vel non of the liability proof at issue in the Cox and Ryan opinions. A disagreeing party may file an apt motion.



Signed By:

*Robert E. Wier*

**United States District Judge**